## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MAHER TERMINALS, LLC,** | Civ. No. 2:12-6090 |
| **Plaintiffs,** | (KM)(MAH) |
| **v.** | |
| **PORT AUTHORITY OF NEW YORK AND NEW JERSEY et al.,** | **OPINION** |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

This matter comes before the court on the motion of Defendants Port Authority of New York and New Jersey ("Port Authority") and Patrick J. Foye to dismiss the complaint (Docket No. 12) brought by Plaintiff Maher Terminals, LLC ("Maher"). For the reasons set forth below, the motion to dismiss is **GRANTED**.[1]

## I.    BACKGROUND

Maher brings this Complaint against Port Authority and Foye challenging charges and fees assessed by Port Authority, including charges under a long-term rental agreement. Compl. ¶ 1. Maher alleges that these charges and fees are unlawful in that they violate Section 208 of the Water Resources Development Act of 1984 ("WRDA"), 33 U.S.C. § 2236; the Rivers and Harbors Appropriation Act of 1884 ("RHA"), as amended, 33 U.S.C. § 5(b); and the Tonnage Clause of the United States Constitution, Art. 1, § 10. *Id.* Solely for the

---

[1]      On June 20, 2014, I filed a Disclosure and Order advising the parties that my former firm, and to some extent I personally, represented Port Authority in unrelated matters. *See Docket No. 77.* This did not, in my estimation, require my recusal. In an excess of caution, pursuant the Code of Conduct for United States Judges, I invoked the remittal procedure of Canon 3C(1) to afford the parties and their lawyers the opportunity to object anonymously to my presiding over this case. The order stated, in accordance with the remittal procedure, that I would recuse if any party objected. I am informed by the clerk that no objection was received.

purposes of this motion dismiss, I take the following allegations of the Complaint as true.

### A.   Parties and Facilities

Maher is a limited liability company organized under the laws of the state of Delaware with its main corporate office in Elizabeth, New Jersey. Compl. ¶ 4. Maher is one of the world's largest multi-user marine container terminal operators. It has operated at Port Elizabeth, stevedoring vessels that are berthing and loading and unloading cargo, for over 60 years. *Id.* ¶ 11. Maher's marine container terminal in Port Elizabeth is the largest in the Port of New York and New Jersey. *Id.* ¶ 12.

Defendant Port Authority is a body created by compact between New Jersey and New York, with the consent of Congress. *Id.* ¶ 5. Its offices are located in New York City. *Id.* Defendant Patrick J. Foye is the Executive Director of Port Authority. *Id.* ¶ 6. Port Authority operates an airport system, marine terminals and ports, the PATH rail transit system, six tunnels and bridges between New York and New Jersey, Port Authority Bus Terminal, and the World Trade Center. *Id.* ¶ 13. It also operates marine terminal facilities, one of which is the terminal leased to Maher in Port Elizabeth. *Id.*

Port Authority's marine terminals consist of one or more piers, wharves, docks, bulkheads, slips, basins, vehicular roadways, intermodal container transfer facilities, railroad connections, side tracks, sidings or other buildings, structures, facilities, or improvements. The terminals are used to accommodate steamships or other vessels and their cargoes or passengers. Port Authority operates, manages, controls, or leases the terminals. *Id.* ¶ 16.

The marine terminals include public cargo facilities and leased cargo facilities. *Id.* ¶ 17. Port Authority's public cargo facilities are the cargo buildings and open areas at a marine terminal designated by Port Authority for the handling of waterborne cargo and the holding of such cargo for further transportation. *Id.* ¶ 18. Port Authority's leased cargo facilities are the cargo buildings and open areas at a marine terminal operated by firms, corporations, partnerships or individuals under agreements with Port Authority, and are designated "from time to time" for the holding of waterborne cargo for further transportation. *Id.* ¶ 19. Port Authority also has container terminal facilities, which are leased cargo facilities used primarily for the purpose of receiving and delivering ocean-shipping containers for loading to and unloading from vessels. *Id.* ¶ 20. Port Authority's Intermodal Container Transfer Facilities are leased

cargo facilities used primarily for the purpose of loading ocean-shipping containers to or unloading them from railroad trains or rail cars. *Id.* ¶ 21.

Port Authority owns, controls, or leases all of the marine container terminal facilities in the Port of New York and New Jersey, including the Maher Terminal, the APM terminal, the Port Newark Container Terminal (PNCT), the New York Container Terminal (NYCT), and the Global marine terminal. *Id.* ¶ 22.

### B.   Port Authority's Charges and Fees

Port Authority levies fees and charges for the use of its marine terminals. *Id.* ¶ 23. For public cargo facilities, it collects dockage, wharfage, demurrage, and related services fees from vessels and cargo using the terminals pursuant to a tariff for all of its public berths. *Id.* ¶ 24. For leased cargo facilities, Port Authority collects fees and charges directly from the terminal operators, which in turn collect fees and charges from vessels and cargo using the terminals. *Id.* ¶ 25.

Maher leases its container terminal in Port Elizabeth from Port Authority pursuant to a thirty-year lease agreement. EP-249, FMC Agreement No. 201131 ("EP-249" or the "Lease") (Docket No. 12-4).[2] *Id.* ¶ 26. Under the lease, Maher is authorized to use the container terminal only for stevedoring, primarily of container vessels and associated cargo containers, as well as activities incident to stevedoring. *Id.* ¶ 27 (citing EP-249 § 6(a)). Maher's right to berth vessels at the terminal is limited to seagoing vessels that Maher stevedores, and to operations incident to berthing and handling cargo for seagoing vessels. *Id.* ¶ 28 (citing EP-249(b)).

Under the lease, Port Authority levies and collects charges and fees for the use of Maher's marine terminal and seagoing vessel berthing rights. It does so under a "Basic Rental" agreement and a "Cargo Throughput" rental agreement. *Id.* ¶ 29.[3]

---

[2]    The lease, which is referred to throughout the Complaint, is proffered by Defendants in conjunction with their motion to dismiss. I will take judicial notice of the lease because it is relied on and cited in Maher's Complaint. *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (Court may take judicial notice of a document "*integral to or explicitly relied* upon in the complaint" without converting motion to dismiss to summary judgment motion) (emphasis in original).

[3]    The lease also levies "other charges and fees, including interest on Port Authority provided terminal construction financing." *Id.* ¶ 30. That "financing,"

The "Basic Rental" fee charge for the use of Maher's marine terminal is calculated per acre and is increased annually by two percent. Compl. ¶ 31; Def. Br. (Docket No. 12-1) at 7 (citing EP-249 § 3(A)(a)-(b)). At the time the Complaint was filed in 2012, the Basic Rental charge was $50,413 per acre, for a total charge of $22,433,612 per year. *Id.* ¶¶ 32, 34.

The Container "Throughput Rental" fee is based on the number of containers loaded and unloaded at Maher's terminal. *Id.* ¶ 36; Def. Br. at 7 (citing EP-249 §§ 4, 42). Port Authority began charging Maher the Container Throughput Rental fee as of October 1, 2008. *Id.* ¶ 38. Port Authority charges a minimum throughput rental per annum ("Minimum Throughput Rent") and requires a minimum number of containers per annum as a condition of maintaining the lease ("Terminal Guarantee"). *Id.* ¶ 40. Regardless of the number of containers actually loaded or unloaded, Port Authority requires Maher to guarantee to pay Minimum Throughput Rent on the equivalent of 775,000 containers annually. For the first 356,000 containers, however, there is no per container charge. *Id.* ¶¶ 39, 41.

As of October 1, 2012, Maher alleges, Port Authority was to increase the Throughput Rent charges from $19.00 to $21.00 for each container over 356,000 up to 980,000, and from $14.25 to $15.75 for each container above 980,000 per annum. *Id.* ¶ 39. Through a "Terminal Guarantee," Port Authority requires Maher to guarantee to load or unload from vessels at the terminal a minimum of 420,000 actual containers annually. *Id.* ¶ 42. The Terminal Guarantee level is subject to increase to 900,000 actual containers annually upon the deepening of the federal navigation channels to 50 feet and their availability for use. As of October 1, 2012, Port Authority's guaranteed Throughput Rent charges for the use of Maher's marine terminal and seagoing vessel berthing rights were to increase from $7,961,000 to $8,799,000 in guaranteed throughput revenue per year. *Id.* ¶ 43.

Maher loaded or unloaded 1,024,561 ocean-shipping containers in 2008; 817,490 in 2009; and 1,029,679 in 2010. *Id.* ¶ 44. In 2008, at the then-effective container rates, Maher paid Port Authority approximately $12.5 million in actual Throughput Rent. *Id.* ¶ 45. At post-October 2012 rates, Maher expected to pay approximately $14 million in Throughput Rent based on a similar number of containers. *Id.* ¶ 46. Maher alleges that the cost or level of services provided by Port Authority, or available to vessels and cargo upon

---

according to Port Authority, consists of construction advances for "leasehold improvements." Def. Br. (Docket 12-1 at 7) (citing EP-249 § 7).

which the Throughput Rent charges are based, do not increase as the number of containers increases or as the Throughput Rent charges increase. *Id.* ¶ 49.

Maher alludes to other types of charges or fees, to which Maher itself has not been subject. Port Authority levies certain additional port charges and fees on operators of leased marine terminal cargo facilities in other leases or permits. Port Authority also levies other charges and fees not expressed in leases or permits, including fees and other financial consideration required for consent to changes of ownership or control interests in marine container terminal leases. *Id.* ¶¶ 50-51. Port Authority allegedly also levies still other charges, including intermodal rail and trucking charges, and federal and state funds and grants. *Id.* ¶ 52.

## C.   WRDA Navigation Improvement Projects

Port Authority is a "Local Sponsor" of WRDA navigation projects, including the projects to deepen to 50 feet portions of navigational channels such as the Kill Van Kull and Newark Bay Channels, the Port Jersey Channel, the Arthur Kill Channel, and the New York and New Jersey channels. *Id.* ¶ 53. Port Authority had incurred over $400 million in Local Sponsor share costs for those WRDA navigational channel deepening projects, and project maintenance was projected (at the time of the Complaint's filing) to exceed one billion dollars. *Id.* ¶¶ 57-58.

The WRDA permits non-Federal interests to recover these share costs through port and harbor fees under certain conditions. 22 U.S.C. § 2236. However, Port Authority has not established an authorized Local Sponsor share cost recovery user fee pursuant to 33 U.S.C. § 2236. *Id.* ¶ 59. Maher asserts that Port Authority is aware that section 208 of the WRDA prescribes "the permissible means" to recover Local Sponsor share costs. *Id.* ¶ 87.

Maher alleges that Port Authority, instead of using those "permissible means," is unlawfully recovering its WRDA Local Sponsor share costs from marine terminal users—specifically container vessels, containerized cargo, and other vessels and cargo, using marine terminals owned, controlled, or leased by Port Authority—by including the costs in charges and fees for the use of marine container terminals. *Id.* ¶ 60. Port Authority allegedly allocated revenue collected and to be collected from New Jersey leased container terminals, including Maher, to pay for its Local Sponsor share costs. *Id.* ¶ 60-63. Maher alleges that Port Authority allocates the share costs on a per acre basis, including the 445 acres of the Maher terminal. *Id.* ¶ 64.

5

Maher alleges that the revenue Port Authority derives from the use of Maher's terminal exceeds the WRDA Local Sponsor share costs allocated to New Jersey marine container terminals. *Id.* ¶ 68. Between 2007 and 2011, Port Authority allegedly recovered over $300 million in revenue from marine container terminals for consents to changes of control or ownership and allocated it to the payment of share costs (although Maher does not allege that it contributed to that revenue, *see* Section I.A at pp. 4-5, *supra*). *Id.* ¶ 73. Port Authority also allegedly allocates excessive Local Sponsor share costs to marine container terminals, including Maher, from Throughput Rental rates and fees Maher pays to Port Authority. *Id.* ¶¶ 75-78.[4] Maher alleges that the allocated costs exceed the costs of the services provided by Port Authority to vessels and cargo.[5] *Id.*

## D.  Procedural History Between Maher and Port Authority

Before filing the present action, Maher filed two cases regarding marine terminal leases against Port Authority in the Federal Maritime Commission.

### 1. 2008 FMC Action

The first action, filed in 2008 before the FMC, alleged that Maher's lease terms were discriminatory as compared with those of the APM Terminals North America Inc. ("APM"), another Port Elizabeth terminal operator, in violation of the Shipping Act of 1984, 46 U.S.C. § 40101. Def. Br. at 8; *Maher Terminals, LLC v. The Port Authority of New York and New Jersey*, Docket No. 08-03 (FMC 2008).[6]

Two pre-trial orders have been entered in that proceeding. Maher Letter (Docket No. 68) at 1. First, the Commission granted in part and denied in part Port Authority's motion for summary judgment on statute of limitations

---

[4]     Maher also contends that revenue derived on a per container basis from New Jersey marine terminals results in more revenue than from New York marine terminals. The revenue generated from Maher's terminal is used to subsidize other terminals and for other purposes not benefiting the vessels and cargo using Maher's container terminal. *Id.* ¶¶ 79-84. It is not clear how these allegations are tied to the WRDA, other than that the revenue may be used, at least in part, to pay WRDA Local Sponsor share costs, as discussed above.

[5]     The Complaint does not specify whether these are services directly provided to the vessels and cargo by Port Authority, or by Maher.

[6]     Docket available at fmc.gov/electronic_reading_room/docket_proceedings.aspx.

grounds, affirming the decision of the ALJ below. The Commission granted summary judgment in part, finding that Maher's discriminatory lease term claim for reparations under the Shipping Act was time-barred. Summary judgment was denied, however, as to Maher's claim for a cease and desist order. Docket No. 08-03 (FMC Jan. 31, 2013). After Maher prematurely appealed the Order to the United States Court of Appeals for the D.C. Circuit, the Commission denied Maher's petition for reconsideration. Order, Docket No. 08-03 (FMC Feb. 11, 2014). Maher asserts that these Orders are now on appeal to the D.C. Circuit and are awaiting decision. Maher Letter at 1.

Most recently, Presiding FMC Officer Erin M. Wirth issued a decision on the merits that resolved all of the issues in the 08-03 action and dismissed each of Maher's claims with prejudice.[7] Opinion, Docket Nos. 08-03 and 07-01 (FMC April 25, 2014). Wirth found that the evidence did not demonstrate a violation of the Shipping Act. The "complex thirty-year maritime leases" at issue resulted from years of negotiation between sophisticated parties on the particular facts and circumstances presented. *Id.* at 3. Wirth concluded that differences between the leases Port Authority had with Maher and with another tenant were justified and not discriminatory. *Id.* at 3, 53, 54. Defendants have indicated that Maher plans to appeal that decision to the full Commission. (Docket No. 72 at 1).

### 2. 2012 FMC Action

The second case, also filed before the FMC, alleged a number of violations of the Shipping Act by Port Authority, including: (i) its practice of requiring economic consideration when a terminal operator seeks Port Authority's consent to a transfer of a lease, or to a change in control; (ii) the restructured lease agreement Port Authority entered into with Port Newark Container Terminal in 2011; (iii) inclusion of general release and waiver provisions, liquidated damages clauses, and lease rate renewal and/or extension provisions in marine terminal leases; (iv) its decision to allow APM to defer certain expenditures under its lease to 2017; and (v) the letting of the marine terminal facility at Port Jersey that is now leased to Global Terminal & Container Services, LLC. Def. Br. at 9; *Maher Terminals, LLC v. The Port*

---

[7]      The decision was appended to Defendants' April 29, 2014 letter. (Docket No. 72).

*Authority of New York and New Jersey*, FMC Docket No. 12-02.[8] A decision in this proceeding is still pending in the FMC. Maher Letter (Docket No. 68) at 1.

### 3. This Federal Action

On September 28, 2012, Maher filed its Complaint in this proceeding, alleging that the charges and fees assessed by Port Authority, including basic rental, cargo throughput rental, interest on Port Authority-provided terminal construction financing, and change of control consent fees, are in violation of the Tonnage Clause, the RHA, the WRDA, and tort law. (Docket No. 1). Defendants Port Authority and Foye filed this motion to dismiss on November 8, 2012. (Docket No. 12). Following numerous discovery disputes between the parties, discovery was temporarily stayed by Magistrate Judge Michael A. Hammer until May 12, 2014. Order (Docket No. 71) at 1. Pending further proceedings, the stay of discovery remains in place.

## II.   DISCUSSION

Port Authority makes a variety of arguments in its motion to dismiss. It argues that Maher has failed to state a claim under the Tonnage Clause, the RHA, and the WRDA. It further alleges that the Court does not have subject matter jurisdiction over Maher's negligence claim, and that all of Maher's claims related to Charges and Fees in Lease EP-249 are time-barred. Def. Br. at i. For the reasons set forth below, Maher's Complaint will be dismissed in its entirety.

### A. Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)

Port Authority argues that Maher has failed to state a claim for relief under the Tonnage Clause, the RHA, and the WRDA. To state a valid claim for relief, the Complaint must contain: (1) a short and plain statement of the grounds for the court's jurisdiction; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought. Fed R. Civ. P. 8(a).

The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a Rule 12(b)(6) motion, a court must take the allegations of the complaint as true and draw reasonable inferences in favor of the Plaintiff.

---

[8]      Docket available at fmc.gov/electronic_reading_room/docket_proceedings.asox.

*Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008).

The Third Circuit has usefully distilled the Rule 12(b)(6) analysis to three steps:

> To determine whether a complaint meets the pleading standard, our analysis unfolds in three steps. First, we outline the elements a plaintiff must plead to a state a claim for relief. *See* [*Iqbal,* 556 U.S.] at 675; *Argueta*, 643 F.3d at 73. Next, we peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. Finally, we look for well-pled factual allegations, assume their veracity, and then "determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. This last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

*Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

For reasons of logic and convenience, the counts of the Complaint are discussed out of order.

### B.   Tonnage Clause (Count 3)

The Tonnage Clause of the United States Constitution provides that "[n]o State shall, without the Consent of Congress, lay any Duty of Tonnage." Art. I, § 10, Cl. 3. Maher alleges that Port Authority's marine container terminal charges and fees, including volumetric throughput charges pertaining to containerized cargo loaded and unloaded at the container terminals, constitute charges for "the privilege of entering, trading in, or lying in port" and therefore are illegal duties of tonnage. Compl. ¶ 115. Maher further alleges that the fees

9

do not benefit the vessels and cargo using its terminal, and are excessive.[9] *Id.* ¶¶ 116-18. Port Authority argues that the Tonnage Clause has no application to the marine terminal charges at issue. Def. Br. at 13.

When the Clause was written, a "Duty of Tonnage" referred to a duty imposed upon a ship which varies according to "the internal cubic capacity of a vessel." The scope of the Tonnage Clause has since been interpreted in light of its purpose, consistent with other constitutional provisions, to restrain the state from exercising taxing power "injuriously to the interests of others." *Polar Tankers, Inc. v. City of Valdez, Alaska*, 557 U.S. 1, 6-7 (2009) (quoting J. Story, Commentaries on the Constitution of the United States § 497, p. 354 (1833) (abridged version)). The clause is also understood as "reflecting an effort to diminish a State's ability to obtain certain geographical vessel-related tax advantages" regardless of whether the vessels are transporting goods between states and foreign nations, or only between the states. *Id.* Without this restriction, states could nullify the prohibition against duties on imports and exports by taxing the vessels transporting the merchandise. *Id.* at 7.

In light of this overarching intent, the Supreme Court has held that the Tonnage Clause prohibits not only a pro-rata tax, but "any duty" on the ship, whether a fixed sum on its whole tonnage, or a sum ascertained by basing the rate of the duty on the amount of tonnage. *Id.* at 8 (citing *Steamship Co. v. Portwardens*, 6 Wall. 31, 35, 18 L.Ed. 749 (1867)). A State may not "effect the same purpose" by "graduating [the duty] on the number of masts, or of mariners, the size and power of the steam-engine, or the number of passengers." *Id.* at 8 (*Passenger Cases*, 7 How. 283, 458-59, 12 L.Ed. 702 (1849)). Therefore, the prohibition has been "deemed to embrace all taxes and duties regardless of their name or form, and even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port." *Id.* (citing *Clyde Mallory Lines v. Alabama ex rel. State Docks Comm'n*, 296 U.S. 261, 265-66, 56 S.Ct. 194, 80 L.Ed. 215 (1935)).

However, while the Clause forbids charges for the privilege of entering, trading in, or lying in a port, it does *not* operate as a ban on "*any and all* taxes which fall on vessels that use a State's port, harbor, or other waterways." *Id.* at 9 (emphasis in original). The Clause cannot be read to give vessels a

---

[9]     Maher alleges the charges and fees exceed the costs to provide services to vessels and cargo and to enhance the safety and efficiency of interstate and foreign commerce. Compl. ¶ 116.

preferential tax exemption vis-à-vis other property and its owners in a seaboard State. *Id.* The Clause also does not apply to charges made by a state authority for "services rendered to and enjoyed by" a vessel, such as pilotage, towage, loading and unloading cargoes, wharfage, storage, and the like. *Clyde Mallory Lines*, 296 U.S. at 265-66.

Thus the relevant inquiry is whether the duty in question imposes "a charge for the privilege of entering, trading in, or lying in a port," which would bring it within the prohibition of the Tonnage Clause. *Polar Tankers*, 55 U.S. at 9. As Port Authority points out, the Clause has never been applied to charges not assessed on vessels or passengers. Def. Br. at 13. Plaintiff Maher, it points out, is not a "vessel"; it is a marine terminal operator that leases space from Port Authority. Compl. ¶ 11. The allegations in the Complaint pertain to the charges and fees levied against Maher, not against the vessels (or passengers) with which Maher does business.[10]

Maher responds that the scope of the rental charges and fees assessed by Port Authority is a factual question not suitable for resolution on a motion to dismiss. Port Authority, says Maher, is illegitimately trying to evade the scope of the RHA and Tonnage Clause by indirectly assessing fees on vessels and cargo. Opp. (Docket No. 26) at 16, 21.

Contrary to the usual situation on a motion to dismiss, it is plaintiff Maher that is going beyond the four corners of the Complaint. Maher, as an on-land terminal operator, is not a "vessel" (or cargo or passengers) for the purposes of the Tonnage Clause. Further, the Complaint does not directly allege that any of the charges and fees assessed under Maher's lease with Port Authority are passed down to or paid by the vessels that Maher stevedores. The only allegation linking Maher's lease fees with vessels and cargo is a general statement that for leased marine terminals (as opposed to public terminals), Port Authority collects fees and charges directly from terminal operators, and that the terminal operators collect fees and charges from vessels and cargo. Compl. ¶ 25.

---

[10]     While the Complaint notes a variety of charges, it identifies only three types of charges actually assessed against Maher: (1) basic rental, (2) throughput rental, and (3) charges related to construction advances for leasehold improvement. Compl. ¶¶ 29, 30, 31, 35; Def. Br. at 7. Each of these charges is included in the lease agreement between Port Authority and Maher. *See* EP-249 §§ 3, 4, 7, 42. Maher alleges that Port Authority also levies "other port charges and fees" on marine terminal operators, but it does not allege that it pays any of them. *See* Compl. ¶ 50.

That generalized allegation is not enough to constitute a plausible factual allegation that an unlawful tonnage duty has been laid on vessels or cargo. Not all charges and fees are prohibited by the Tonnage Clause. Although it prohibits any duty on a vessel, it does not prohibit a State from taxing or assessing fees on any and all businesses related to shipping. *See Polar Tankers*, 55 U.S. at 8. Thus, although the Tonnage Clause prohibits cargo-based taxes and charges on vessels entering, trading in, or lying in port, that prohibition does not extend to all cargo-based fees assessed against businesses operating in a port or harbor's terminal. Such a broad reading would far exceed the intent of the Clause "to diminish a State's ability to obtain certain geographical *vessel-related* tax advantages." *Id.* at 7 (emphasis added).

To be sure, there is a family resemblance between some of the charges paid by Maher and those that would be unlawful if imposed by Port Authority on a vessel entering, operating or lying in the port. The lease agreement between Maher and Port Authority includes a Throughput Rental agreement, under which Maher's fees are based on the volume of cargo loaded and unloaded. Compl. ¶¶ 35-49; 115. A similar fee charged to a vessel operating in the port might merit consideration under the Tonnage Clause. But Maher is not a vessel or other protected entity under the Tonnage Clause, and Maher has not alleged facts sufficient to show that the charges amounted to an indirect tonnage duty on vessels and cargo. Thus, Maher does not have standing to assert this claim[11] and the claim must fail as a matter of law.

Maher's allegation that the charges and fees assessed by Port Authority are excessive is also insufficient to withstand a motion to dismiss. Even if Maher were a protected entity, most (if not all) of the rental charges and fees imposed by Port Authority against Maher would likely be the type of charges

---

[11] Maher argues in its Opposition that Defendants waived standing arguments by only referring to it in footnotes in their brief. *See* Opp. at 38-39.  This assertion is incorrect, and in any case, inconsequential. There is no unfair surprise. Defendants argued throughout their brief that the pertinent limitations in the Tonnage Clause, RHA, and WRDA did not apply to Maher because it is a marine terminal operator. Accepting all the allegations in the Complaint as true, there is not a sufficient basis for finding that Maher has plausibly asserted a claim for relief under the Tonnage Clause. *See In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d. Cir. 2012) (explaining that standing is considered under Rule 12(b)(1) because it is jurisdictional, but that courts apply Rule 12(b)(6) review to determine whether Complaint adequately pleads standing).

"for services rendered" that fall outside the Tonnage Clause's scope.[12] *Clyde Mallory Lines*, 296 U.S. at 266. Maher alleges generally that Port Authority collects fees directly from marine terminals for dockage, wharfage, demurrage, and related services, and that terminals then collect fees from vessels and cargo using the facilities. Compl. ¶ 25; Opp. at 39. When assessed against vessels and their cargo and passengers, these types of service fees must be apportioned to the services' benefits "as closely as is practicable." *Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority*, 567 F.3d 79, 88 (2d Cir. 2009) (citing *Plaquemines Port, Harbor & Terminal District v. Federal Maritime Comm'n*, 838 F.2d 536, 545 n. 8 (D.C.Cir.1988)).[13]

The *Bridgeport* Court found that a passenger fee assessed by the Bridgeport Port Authority violated the Tonnage Clause because it was used for the impermissible purpose of raising general revenues and other projects that did not benefit ferry passengers. *Id.* at 88. But unlike the charges contested by Maher, the passenger fee for ferry docking in Bridgeport was clearly within the scope of the Tonnage Clause because the charge was paid by the ferry operator. *See id.* Maher's marine terminal lease and service charges are outside that scope. Maher has not alleged facts sufficient to show that its fees and charges function as even an indirect tonnage duty.[14]

---

[12]    The cases discussing service charges under the Tonnage Clause pertain to fees assessed directly to vessels or their cargo (including pilotage, towage, charges for loading and unloading cargoes, wharfage, and storage). *See e.g. Clyde Mallory Lines*, 296 U.S. 261, 265 (1935); *Cooley v. Bd. of Wardens of Port of Philadelphia, to Use of Soc. For Relief of Distressed*, 53 U.S. 299, 314 (1851); *Keokuk Northern Line Packet Co. v. City of Keokuk*, 95 U.S. 80, 84 (1877); *Plaquelines Port and Terminal Dist. V. Federal Maritime Comm'n*, 838 F.2d 536, 545 (D.C. Cir. 1988). There do not appear to be any reported federal cases assessing service charges as to terminal operators/stevedores under the Tonnage Clause.

[13]    ALJ Wirth's recent decision in the 08-03 FMC proceeding found that Maher's long term lease rates—including the basic rental, throughput rental, and terminal guarantee—corresponded with the benefits that Maher received under the agreement and thus did not violate Section 41102(c) of the Shipping Act. Opinion, Docket No. 08-03 (FMC April 25, 2014) at 54. Wirth noted that under the long-term lease, Maher's rented property was convenient to express rail and other services, and the property was not competitively bid to other potential tenants. *Id.* Although the FMC Shipping Act decision is not dispositive here, these findings shed some light on the respective positions of the Parties under the lease agreement.

[14]    In further support of this argument, Maher analogizes to a case where a charge that did not facially implicate the Commerce Clause was nonetheless found to violate it because of the charge's practical effects. *See* Opp. at 17 (citing *W. Oil & Gas Ass'n v.*

In sum, the charges and fees at issue in Maher's Complaint do not implicate the Tonnage Clause, and Maher has failed to state a claim for relief. The Defendants' motion to dismiss will be granted as to Count 3.

### C.   RHA (Count 2)

Maher alleges a separate claim for relief under the Rivers and Harbors Act. 33 U.S.C. § 5(b); Compl. ¶¶ 103-111. Like the Tonnage Clause, this section of the RHA was intended to ensure free navigation by preventing tolls or charges from being collected from vessels operating on navigable waters. *See Indiana Port Comm'n v. Bethlehem Steel Corp.*, 835 F.2d 1207, 1210 (7th Cir. 1987) (citing H.R.Rep. No. 1554, 48th Cong., 1st Sess. 6 (1884)). The RHA states in relevant part:

> No taxes, tolls, operating charges, fees, or any other impositions whatever shall be levied upon or collected from any vessel or other water craft, or from its passengers or crew, by any non-Federal interest, if the vessel or water craft is operating on any navigable waters subject to the authority of the United States, or under the right to freedom of navigation on those waters, except for—
> (1) fees charged under section 2236 of this title;
> (2) reasonable fees charged on a fair and equitable basis that—
>> (A) are used solely to pay the cost of a service to the vessel or water craft;
>> (B) enhance the safety and efficiency of interstate and foreign commerce; and
>> (C) do not impose more than a small burden on interstate or foreign commerce; or
> (3) property taxes on vessels or watercraft, other than vessels or watercraft that are primarily engaged in foreign commerce if those taxes are permissible under the United States Constitution.

---

*Cory*, 726 F.2d 1340 (9th Cir. 1984), in which the Court found that "rental" charge for oil pipeline assessed on volumetric basis violated the Commerce Clause). While the desire for comparison is understandable, the Tonnage Clause is not a maritime analog to the Commerce Clause on this point. As discussed throughout this Opinion, the Tonnage Clause's application is limited to vessels (and their cargo and passengers) operating on the navigable waters and does not reach the full scope of maritime-related commerce. It is not within this Court's authority to expand the Tonnage Clause's scope with an analogous "effects" analysis.

*Id.*

Maher alleges that its marine container terminals serve "vessels and watercraft operating on the navigable waters subject to the authority of the United States." Compl. ¶ 105. Maher alleges that the fees and charges imposed by Port Authority are not lawful under the Act because they do not fall under Section 2236 (the WRDA); are not reasonable; are not charged on an equitable basis; are not used to service the vessels and water craft or enhance safety and efficiency; and impose more than a small burden on interstate commerce. *Id.* ¶¶ 107-111. As discussed in the context of Maher's Tonnage Clause claim, there is no allegation that the charges and fees assessed against Maher are actually paid by vessels, watercraft, or their passengers. *See* Compl. ¶¶ 108-111.

Instead, Maher argues in its Opposition Brief that whether the charges and fees "operate" as charges on a vessel or cargo is a question of fact not determinable at the motion to dismiss stage. *See* Docket No. 26 at 16. The Complaint, however, merits the shelter of that "issue of fact" reasoning *only* if it alleges a cause of action as a matter of law and plausibly pleads facts making out a claim. (*See* description of *Iqbal* three-step analysis at p. 9, *supra.*) This Complaint does not.

There is little case law applying this RHA provision. The language closely tracks that of the Commerce and Tonnage clauses, and it makes sense to interpret it in parallel fashion. *See Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority*, 566 F. Supp. 2d 81, 102-103 (D. Conn. 2008) (declining to reach application of statute in light of constitutional claim and noting that a private right of action under the statute is open question). But even viewed in isolation, the plain language of the statute is clear enough to permit a conclusion that it does not apply to Maher's claims. *See Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001) ("Where the statutory language is plain and unambiguous, further inquiry is not required."). Like the Tonnage Clause, Section 5(b) of the RHA is limited to "any vessel or water craft, or . . . its passengers or crew." 33 U.S.C. § 5(b). *See also Reel Hooker Sportfishing, Inc. v. State Dep't of Taxation*, 236 P.3d 1230, 1234 (Haw. Ct. App. 2010) (holding that the express language Section 5(b) refers only to *vessels* and their *passengers and crews*) (emphasis in original).

As discussed above in the context of the Tonnage Clause, the facts as alleged in the Complaint provide no basis for viewing the charges and fees Port Authority assesses against Maher as illegal duties. Maher does not allege that

it is a "vessel, or water craft, or ... its passengers or crew." It does not plausibly allege facts to establish that the rental charges and fees are paid by or passed on to vessels or watercraft protected under Section 5(b) There is no case law suggesting that Section 5(b) applies to a marine terminal operator as a matter of law.[15] Therefore, Maher does not have standing to bring a claim under the RHA, and has failed to state a claim for relief under the RHA. The Defendants' motion to dismiss the Complaint will be granted as to Count 2.

### D.   WRDA (Count 1)

Maher also alleges that Port Authority's container terminal charges and fees violate the Water Resources Development Act, 33 U.S.C. § 2236. Compl. ¶¶ 93-102.[16] The WRDA establishes a cost sharing mechanism between the federal government and "non-Federal interests" to finance harbor navigation projects for harbors or inland harbors. 33 U.S.C. § 2211. Pursuant to the WRDA, a "non-Federal interest" may levy port or harbor duties on a vessel engaged in trade entering or departing from a harbor and on cargo loaded on or unloaded from that vessel, subject to certain conditions, to recover its "Local Sponsor" share costs incurred from harbor navigation projects. 33 U.S.C. § 2236(a).

Port and harbor dues levied under the WRDA must meet the following conditions. First, they may be levied only in conjunction with a harbor

---

[15]     The Alaska Supreme Court held that Section 5(b) applied to "rent" charges assessed on a per passenger basis against Alaska Riverways, the operator of paddlewheel tour boats on Chena River in Fairbanks, Alaska. *State Dep't of Natural Resources v. Alaska Riverways, Inc.*, 232 P.3d 1203, 1222 (Alaska 2010). The Court found the lease fee charged by the state illegal under the RHA and Tonnage clause because it was assessed on a per passenger basis and thus converted the rental charge into a charge for the use of navigable waters. Although an analogy can be drawn to the cargo-based Throughput Rental agreement between Port Authority and Maher, the posture of the parties here is distinct. Unlike the paddleboat operator in *Alaska Riverways*, Maher does not operate any vessels or watercraft, and is not a user of the navigable waters. Maher's stevedoring business is certainly part of maritime commerce. However, the rental fee for Maher's use of the terminal—even on a cargo volume basis—cannot be similarly equated to a charge against vessels entering or lying in port without some allegation by Maher that the charges are passed on to or paid by the vessels.

[16]     Maher refers to this 33 U.S.C. § 2236 as "Section 208 of the WRDA." *See* Compl. ¶¶ 95, 100, 101. For consistency and to avoid confusion, I refer to it herein as "Section 2236."

navigation project whose construction is complete, in amounts not to exceed those necessary to fund a permissible purpose.[17] 33 U.S.C. §2236(a)(1). Second, port and harbor dues may *not* be levied in connection with a navigation improvement project on any vessel that could have utilized the harbor without the improvement. *Id.* at (a)(3). Third, port or harbor dues may be levied "only on a vessel entering or departing from a harbor and its cargo on a *fair and equitable basis*." *Id.* at (a)(4) (emphasis added).[18] In addition, there must be proper notice and a hearing before the Secretary of Army; the schedule of dues must be filed with the Secretary and the FMC and made available for public inspection by the FMC; and ongoing reporting and auditing requirements must be met. *Id.* at (a)(5)-(6).

Maher alleges that Section 2236 provides the "exclusive method" for a non-Federal interest to recover from users of WRDA projects the Local Sponsor share costs for WRDA construction, or operation and maintenance costs associated with such construction. Compl. ¶ 95. The terminal charges and fees imposed by Port Authority, says Maher, are not imposed pursuant to Section 2236, and are therefore unlawful. *Id.* ¶ 99. Defendants reply that the WRDA is not mandatory or exclusive; it "merely *authorizes* but does not *require*" a non-Federal interest to impose a cost recovery fee pursuant to the statute when imposition of such a fee might otherwise be barred by the Commerce Clause or the Tonnage Clause. Def. Br. at 25. Defendants assert that the WRDA does not prohibit a non-Federal interest from using funds obtained from other sources to cover its share of harbor improvement projects. *Id.* at 25-26.

There is a paucity of case law dealing with port and harbor dues under the WRDA. Analyzing the legislative history of the act, the Fifth Circuit noted that port fees levied for "purposes *other than* harbor improvements" did not conflict with the act's invalidation of certain fees imposed *for* harbor

---

[17]   "Permissible purposes" are identified in the statute: (A) to finance the non-Federal share of construction and operation and maintenance costs of a navigation project for a harbor under the requirements of Section 2211, or to finance the cost of construction and operation and maintenance of a navigation project for a harbor under Section 2232 or 2233 of this title; and (B) to provide emergency response services in the harbor. 33 U.S.C. § 2236(a)(1).

[18]   To determine the appropriate dues, the non-Federal interest may consider (A) the direct and indirect cost of construction, operations, and maintenance, and providing the facilities and services; (B) the value of those facilities to the vessel and cargo; (C) the public policy or interest served; and (D)any other pertinent factors. *Id.* at (a)(4).

improvements. *New Orleans S.S. Ass'n v. Plaquemines Port, Harbor and Terminal Dist.*, 874 F.2d 1018, 1025 (5th Cir. 1989) (emphasis added; discussing predecessor Harbor Development & Navigation Improvement Act ("HDNI," 33 U.S.C. 2236)). That court concluded that the HDNI did not address ports' "long-standing authority" to levy emergency service fees for purposes other than harbor improvements. *Id.*

I think that reasoning is sound, that it suggests an outcome here. While Section 2236 may set conditions on a port's collection of fees for harbor improvements, it does not affect or limit the ports' powers to levy fees and charges for other purposes. Indeed, if Section 2236 were read as Maher suggests, it would require a port to pay project costs solely through the cost-sharing harbor dues mechanism established in the statute, and the port would be prohibited even from paying such costs itself. Following the spirit of the Fifth Circuit's decision in *Plaquemines Port*, I hesitate to read additional restrictions onto Port Authority's payment of Local Sponsor share costs. *See* 874 F.2d at 1027 (reasoning that explicit permission in HDNI for nonfederal ports to recoup harbor improvement costs by charging emergency service costs "in conjunction with" the improvement project when it is finished, does not establish that Congress intended to deny nonfederal ports the authority to impose fees for services performed when no improvement project is undertaken).

The legislative history of WRDA is supportive. *See* S. Rep. No. 99-126 at 56 (1985). The Senate Report stated in relevant part that the section does not require a user fee: "The whole cost, or partial cost, of providing the non-Federal share of project costs, may be carried as a general expense of local government, if non-Federal sponsors so decide." *Id.* The Report explained that authorizing non-Federal interests to charge port and harbor dues was necessary to give them the "flexibility to share in the cost of navigation improvements." *Id.* This history strongly suggests that the WRDA was not intended to prevent the Port Authority (or any non-Federal entity) from using funds it has obtained from other sources of revenue—such as rent or other fees from Port tenants—to pay its Local Sponsor share costs. Def. Br. at 26. More to the point, the language of the WRDA itself contains no such prohibition.

Furthermore, by the same reasoning discussed in the context of the Tonnage Clause and RHA, it does not appear that Section 2236 of the WRDA applies to entities such as Maher Terminals. On its face, Section 2236 applies only to fees levied on a vessel or on cargo loaded and unloaded from that

18

vessel. 33 U.S.C. § 2236(a). The Complaint does not allege that the Defendants imposed port or harbor dues on vessels or cargo; it alleges only that marine terminal fees were imposed on Maher.

These allegations do not state a claim for relief under the WRDA. Maher does not allege facts showing that the Section 2236 applies to the marine terminal charges charged by Port Authority, or that Port Authority has imposed port or harbor dues in a manner inconsistent with Section 2236. Count 1, too, will therefore be dismissed.

### E.   Jurisdiction over Negligence Claim (Count 4)

Count 4 of Maher's Complaint asserts a separate tort claim that Port Authority breached a duty to exercise due care and diligence in establishing and collecting charges and fees for the use of marine container terminals. Compl. ¶¶ 120-121. Maher alleges that Port Authority's actions were a "substantial factor" in causing it millions of dollars of damages. *Id.* ¶ 122. Maher's damages were a "direct and proximate result" of Port Authority's negligence. *Id.* ¶ 123. Count 4 also alleges that Port Authority knowingly acted in a reckless, willful, wanton, and outrageous manner with intentional disregard of Maher's rights for the purpose of financial gain. *Id.* ¶ 124. Maher's briefing asserts no arguments in opposition to dismissal of this count.

The parties dispute whether this tort claim arises under state law or the law of admiralty. *See* Opp. at 29-30; Def. Reply Br. (Docket No. 31) at 9-10. Maher has the burden of pleading the existence of the court's jurisdiction. *Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 177 F.3d 210, 222 n. 13 (3d Cir. 1999). However, Maher's Complaint does not allege a particular jurisdictional basis for the negligence claim. *See* Compl. ¶¶ 119-124. I agree with the Defendants that Maher's Complaint does not state an admiralty tort claim, and that the negligence claim in Count 4 arises under state law.

A plaintiff seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy two conditions: (1) location and (2) connection with maritime activity. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995) (citing *Sisson v. Ruby*, 497 U.S. 358 (1990)). Although the activity giving rise to Maher's claim is connected to maritime activity, it does not meet the location test. To satisfy the location test, the tort must (physically) occur on the navigable water, or an injury on land must be caused by a vessel on navigable water. *Id.* Here, Maher alleges that Port Authority's collection of fees breached the duty it owed to Maher to act

with ordinary care and due diligence. Compl. ¶ 120-121. Maher does not allege that its injury was caused by a vessel, nor does Port Authority's alleged contractual breach constitute a tort occurring on navigable waters.

Therefore, Count 4 must arise under state law. Because I am dismissing the federal claims, I see no basis for retaining Count 4. This Court had original federal-question and maritime jurisdiction over Maher's Complaint pursuant to Counts 1-3. 28 U.S.C. §§ 1331, 1333; Compl. ¶¶ 7-8. Diversity jurisdiction was not alleged, and is not present. 28 U.S.C. § 1332. For the purposes of diversity jurisdiction, the Port Authority is considered a citizen of both New York and New Jersey. *Hines-Maloney v. Port Authority of New York and New Jersey*, Civ. No. 07-6153 (KSH), 2008 WL 4003998, at *8-9 (D.N.J. Aug. 25, 2008); N.J.S.A. 32:1–171; N.Y. Unconsol. L. § 7106. *See also Yancoskie v. Delaware River Port Authority*, 528 F.2d 722, 727 (3d Cir.1975) (finding that Delaware River Port Authority was citizen of both New Jersey and Pennsylvania). Maher Terminals is a citizen of New Jersey with its principal place of business in the state. Compl. ¶ 4; 28 U.S.C. § 1332(c). Defendant Foye's citizenship is not disclosed, but it does not matter; because complete diversity is required, the lack of diversity between Port Authority and Maher is fatal. *Id.*; *Yancoskie*, 528 F.2d at 727.

The remaining state law claim could remain in this case only pursuant to the court's supplemental jurisdiction. *See* 28 U.S.C. § 1367. When a court has dismissed all claims over which it had original jurisdiction, the supplemental jurisdiction statute grants the court discretion to dismiss the remaining state-law claims. 28 U.S.C. § 1367(c)(3). Because no substantial federal question is presented, and there has been no substantial investment of federal-court resources in adjudicating the state claims, dismissal seems the better course. I will decline to exercise supplemental jurisdiction over Count 4, Maher's state law tort claim.[19]

---

[19]     I observe that even if diversity were present, Maher's tort claim would likely be found defective. Maher does not dispute that it failed to give Port Authority sixty days' notice of its tort claim as required under state law. Def. Br. at 28 (citing N.J. Stat. § 32:1-163. Under state law, failure to comply with this provision is viewed as a jurisdictional defect. *Campanello v. Port Authority of N.Y. & N.J.*, 590 F. Supp. 2d 694 (D.N.J. 2008). And Maher has also failed to state a claim of negligence. Count 4 alleges that Maher breached a duty of care by negligently collecting charges and fees upon unlawful bases and in unlawful amounts. Compl. ¶ 121. The charges, as I have already held, are not unlawful under federal law. And no allegation of a breach of a

**F.     Claim for Declaratory and Injunctive Relief (Counts 5, 6 and 7)**

Counts 5, 6, and 7 of the Complaint seek declaratory and injunctive relief, based on the substantive claims alleged in Counts 1-4. Compl. ¶¶ 125-132. Because those substantive claims have been dismissed, these will be dismissed as well.

## III.   CONCLUSION

For the foregoing reasons, Maher's Complaint against Port Authority and Patrick J. Foye is dismissed in its entirety. An Order will be entered in accordance with this Opinion.

Dated:  July 21, 2014

_____
**Hon. Kevin McNulty**
**United States District Judge**

---

state duty appears in the complaint. *See Alloway v. Bradlees, Inc.*, 723 A.2d 960, 967 (N.J. 1999); *Cecile Industries, Inc. v. U.S.*, 793 F.2d 97, 100 (3d Cir. 1986) (federal law duties do not automatically create local tort law duties).